PAUL E. MANASIAN (SB No. 130855)
GREGORY A. ROUGEAU (SB No. 194437)
THOMAS T. HWANG (SB No. 218678)
MANASIAN & ROUGEAU, LLP
400 Montgomery Street, Suite 1000
San Francisco, California 94104
Telephone: (415) 291-8425
Facsimile: (415) 291-8426
Email: manasian@mrlawsf.com
Email: rougeau@mrlawsf.com
Email: hwang@mrlawsf.com

Attorneys for Debtor in Possession,
QMECT, INC.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>QMECT, INC., a California corporation, dba Electrochem,<br>Debtor.<br><br>Employer's Tax I.D. No. 94-2923737 | Chapter 11<br><br>Case No. 04-41044-LT11<br><br>Adv. Pro. No. 04-4077-LT11 |
| QMECT, INC., dba ELECTROCHEM, a California corporation, FRED KOELLING, an individual and LINDA KOELLING, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT D. JUDSON, JR., an individual; JANICE H. JUDSON, an individual; SIERRA FINANCIAL GROUP, INC., a California corporation; BURLINGAME CAPITAL PARTNERS II, L.P., a Delaware limited partnership; BURLINGAME CAPITAL, LLC, a Delaware limited liability company; BURLINGAME CAPITAL MANAGEMENT, LLC, a California limited liability company; and DOES 1 through 100,<br><br>Defendants. | **DEBTOR'S OPPOSITION TO DEFENDANTS' AND CROSS-COMPLAINANTS' MOTION FOR ABSTENTION AND REMAND**<br><br>Date: May 6, 2004<br>Time: 10:00 a.m.<br>Place: 1300 Clay Street, Courtroom 201, Oakland, CA<br>Judge: Hon. Leslie Tchaikovsky |
| ALL RELATED CROSS-ACTIONS | |

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 1 of 22

## TABLE OF CONTENTS

INTRODUCTION . . . . . 1

STATEMENT OF FACTS . . . . . 2

I. BACKGROUND . . . . . 2

A. The Debtor's Relationship With Wells Fargo . . . . . 2

B. The Comerica Debt . . . . . 2

C. The Debtor's Engagement Of Sierra Financial Group As Management Consultant . . . . . 3

D. The Judsons' and Sierra's Conflict Of Interest With Regard To Comerica . . . . . 5

E. Conflicts Of Interest With Regard To The Burlingame Transaction . . . . . 5

F. Threats Of Foreclosure By Sierra And The Judsons, And Commencement Of The State Court Proceeding . . . . . 7

G. Electrochem Funding LLC Purchases The Comerica Note . . . . . 7

II. COMMENCEMENT OF THIS CHAPTER 11 CASE . . . . . 8

III. PROPOSED AMENDMENT OF THE DEBTOR'S COMPLAINT . . . . . 8

LEGAL ARGUMENT . . . . . 8

I. TO THE EXTENT THE DEBTOR WILL ASSERT AN EQUITABLE SUBORDINATION CLAIM AGAINST DEFENDANTS, MANDATORY ABSTENTION IS NOT APPROPRIATE . . . . . 9

A. Criteria For Application Of Mandatory Abstention . . . . . 9

B. Equitable Subordination Is A "Core Proceeding" Under The Bankruptcy Code . . . . . 9

C. Mandatory Abstention Cannot Be Applied To A "Core" Proceeding . . . . . 11

i. To The Extent That Debtor Will Assert An Equitable Subordination Claim Against Defendants, This Litigation Is Not Based Wholly Upon State Court Causes Of Action . . . . . 11

ii. With The Prospective Amendment Of The Complaint, This Litigation Is A "Core Proceeding." . . . . . 11

iii. Whether "Equitable Subordination" Should Be Applied In This Matter Is Necessarily A Federal Question . . . . . 12

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 2 of 22

TABLE OF CONTENTS
(Continued)

iv. The San Mateo Superior Court Cannot Adjudicate Whether Defendants' Claims In This Case Should Be Equitably Subordinated . . . . . 12

II. PERMISSIVE ABSTENTION SHOULD ALSO NOT BE APPLIED TO DEBTOR'S PROSPECTIVE EQUITABLE SUBORDINATION CLAIM . . . . . 12

A. Standards For Permissive Abstention Generally . . . . . 12

B. This Court Should Not Abstain From Hearing Debtor's Equitable Subordination Claim Under 28 U.S.C. 1334(c)(1) . . . . 13

C. The Tucson Estates Factors Militate In Favor Of This Court's Retention Of Jurisdiction . . . . . 15

i. Abstention Would Hinder the Efficient Administration of the Estate . . . . . 15

ii. State Law Issues Are Interwined With An Equitable Subordination Claim . . . . . 15

iii. Relevant State Law Issues Are Not Novel . . . . . 15

iv. This Adversary Proceeding Is Closely Related to the Main Case . . . . . 15

v. As Set Forth Supra, This Case Involves A Core Claim . . . 16

vi. Severance of Claims Is Not Feasible . . . . . 16

CONCLUSION . . . . . 17

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 3 of 22

## TABLE OF AUTHORITIES

### STATUTES

28 U.S.C. § 157 . . . . . . . . 1, 9

28 U.S.C. § 1334(c) . . . . . . . . 1

28 U.S.C. § 1452(b) . . . . . . . . 1

28 U.S.C. § 157(b)(2)(O) . . . . . . . . 8, 11, 14

28 U.S.C. § 1334(c)(2) . . . . . . . . 9, 11

11 U.S.C. § 510(c) . . . . . . . . 9-10, 12

28 U.S.C. § 157(b)(2)(K) . . . . . . . . 11, 14

28 U.S.C. § 1334(c)(1) . . . . . . . . 12, 13, 14

### RULES

Fed. Rules of Bankruptcy Procedure 7001(8) . . . . . . . . 9

### CASES

9281 Shore Road Owners Corp. v. Seminole Realty Co., 214 B.R. 676 (Bankr E.D. N.Y. 1997) . . . . . . . . 9

In re Danbury Square Associates, 153 B.R. 657 (Bankr. S.D.N.Y. 1993) . . . . . . . . 9

Wilson v. Huffman (In re Missionary Baptist Foundation of America Inc.), 818 F.2d 1135, 1142 (5th Cir. 1987) . . . . . . . . 10

Pepper v. Litton, 308 U.S. 295, 306, 60 S. Ct. 238, 84 L. Ed. 281(1939) . . . . . . . . 10

In re EMB Associates, Inc., 92 B.R. 9 (Bankr. D.R.I. 1988) . . . . . . . . 10

In re CRD Sales And Leasing, Inc., 231 B.R. 214, 218 (Bankr. D. Vt. 1999) . . . . . . . . 10, 13, 14, 15, 16

Unsecured Creditors Committee v. Noyes, 73 B.R. 470, 478 (Bankr. D. Vt. 1987 . . . . . . . . 11

Boyd v. Sachs, 153 B.R. 457, 461 (Bankr. W.D. Mich. 1993) . . . . . . . . 11

In re Tucson Estates, Inc., 912 F.2d 1162, 1167 (9th Cir. 1990). . . . . . . . . 12, 13

In re Lazar, 200 B.R. 358, 373 (C.D. Cal. 1996) . . . . . . . . 13

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 4 of 22

**TABLE OF AUTHORITIES**
**(Continued)**

In re Pacific Gas & Electric Co.,
281 B.R.1 (N.D. Cal 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

QMECT, INC. (the "Debtor"), the debtor and debtor-in-possession in the above-referenced Chapter 11 case and one of the named plaintiffs in the above-referenced Adversary Proceeding, hereby respectfully submits its Opposition to the Motion for Abstention and Remand (the "Motion"), filed by ROBERT D. JUDSON, JR., JANICE H. JUDSON, SIERRA FINANCIAL GROUP, INC., BURLINGAME CAPITAL PARTNERS II, L.P., BURLINGAME CAPITAL, LLC, and BURLINGAME CAPITAL MANAGEMENT, LLC (collectively, the "Defendants") as follows:[1]

**INTRODUCTION**

This Court should retain jurisdiction to hear the claims pending in this Adversary Proceeding. The Motion is premature. Prior to the hearing on the Defendant's Motion, the Debtor intends to move to amend its Complaint in this action, in order to assert, among other things, a claim for relief against Defendants for equitable subordination. The Debtor respectfully requests that the Court deny the Defendants' Motion, without prejudice to reconsideration of its merits once the Complaint has been amended by the Debtor.

As set forth in greater detail hereinbelow, the Debtor's equitable subordination claim- on the statutory list of core proceedings set forth in 28 U.S.C. § 157- is based on the allegations and averments originally asserted by the Debtor against the Defendants in the San Mateo Superior Court, and cannot possibly be separated from Debtor's state court claims against Defendants. Until the Court has considered the Debtor's equitable subordination claim, the Court cannot possibly consider whether either 28 U.S.C. § 1334(c) or 28 U.S.C. §1452(b) warrant remanding this Adversary Proceeding back to state court.

An equitable subordination claim is unique to the Bankruptcy Code, and can only be asserted in this forum; the Debtor should not be deprived of asserting that claim at this early stage of the Chapter 11 case, simply because the Defendants are anxious to go to trial. The

[1]Debtor has been informed by counsel for Fred Koelling and Linda Koelling that the hearing on the Defendant's Motion to Remand has been, or will be, continued to May 20, 2004; this Opposition is nevertheless filed presently, in an abundance of caution, to advise the Court and other parties of the issues pertinent to Debtor's Opposition.

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 6 of 22

Motion should be denied.

## STATEMENT OF FACTS

Although the Court, having heard (and denied) the "Motion of Burlingame Capital Partners II, L.P. and Electrochem Funding, LLC. for Dismissal of the Case or, in the Alternative, Relief from the Automatic Stay" (the "Burlingame Motion") at the outset of the case, is familiar with the facts and circumstances underlying the Debtor's action against various Movants herein. Such summary of the facts demonstrates that the underlying litigation between the Debtor and Movants was properly removed to this Court, and should remain here for determination.

### I. BACKGROUND.

The Debtor was incorporated in 1984, and is in the business of providing electroplating and anodizing services, through over 60 chemical processes, to industrial customers. Its customer base consists primarily of metal fabricators and equipment manufacturers, including several fortune 500 technology companies to include, Applied Materials, Lam Research, Mattson Technology, Lockheed Aerospace, Asyst Technology, Boeing, Loral, Sweetcom and Tyco Electronics. Electrochem processes are designed primarily for technical applications to include electronic connectors, integrated circuit manufacturing equipment, medical devices, robotic handling equipment, rf microwave, fiber optic applications, and electronic packaging. It is based in Union City, California. Its founders are Fred and Linda Koelling (collectively, the "Koellings"), who are also named plaintiffs in this Adversary Proceeding.

#### A. The Debtor's Relationship With Wells Fargo.

From the outset of the company's incorporation, through December 31, 1996, both the Debtor and the Koellings maintained banking relationships with Wells Fargo Bank. Wells Fargo, through a series of loans, had loaned the Debtor approximately $1.34 million dollars, to fund its operations.

#### B. The Comerica Debt.

In January 1997, the Debtor entered into a banking relationship with Comerica Bank, and ultimately transferred the balance of its Wells Fargo loans to Comerica. In connection with the Comerica loan, three lines of credit were initially established with Comerica totaling

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 7 of 22

approximately $1.8 million : (1) a building loan; (2) an accounts receivables line; and (3) equipment line, approximately $1.34 million of which was paid to Wells Fargo to pay off all of the Company's outstanding loans with Wells Fargo. Among the purposes of the loan was to construct a state-of-the-art electroplating and anodizing facility necessary for Debtor to become a leader in the Bay Area market for such services.

On or about December 14, 1998, due to cost overruns associated with the construction of Debtor's Union City facility, Comerica- in order to protect its interest in the construction of the facility and the continuance of Debtor's operations- provided Debtor with an additional loan of up to $1.6 million (the "Flat Note Loan"). In connection with the Flat Note Loan, Comerica received a pledge on all of the outstanding shares of Debtor's capital stock. It also received a "fee" of $500,000.00 for making the loan, thus raising the total amount that was ostensibly owed to Comerica under the Flat Note Loan approximately $2.1 million.

Unfortunately, in light of the downturn in the local economy following construction of the facility, the Debtor's technology customers reduced operations, and, in turn, generally reduced their requirements for Debtor's electrical plating and anodizing services. The Debtor continued to service the Comerica debt- and thus was never in payment default- but experienced financial distress as a result of doing so in the midst of the downturn for the demand for its services, while its new facility was being constructed.

**C. The Debtor's Engagement Of Sierra Financial Group As Management Consultant.**

Prior to the completion of the construction of the Debtor's new Union City facility, Comerica recommended Robert D. Judson and Janice Judson (collectively, the "Judsons") and their company, Sierra Financial Group, Inc. ("Sierra"), to the Plaintiffs as a financial advisor. Comerica stated it would "support any strategy" that involved the Judsons and Sierra, and- even though the Debtor was not in monetary default on its indebtedness to Comerica- threatened foreclosure of its security interests in Debtor's assets, if the Judsons and Sierra were not retained by the Debtor.

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 8 of 22

Based on the foregoing, on or about November 18, 1999- just six days before the Debtor completed construction of its new facility- entered into an engagement agreement (the "Engagement Agreement") with the Judsons and Sierra. Pursuant to that Agreement, the Judsons and Sierra were engaged to provide "management consulting services" to Plaintiffs, including but not limited to "management structure, profit responsibility and performance, capital adequacy and acquisition, the Debtor's planning process, and the Debtor's banking relationship and other issues that impact the financial performance and strength of the [Debtor]." They were also "exclusively" engaged to "assist the Debtor in refinancing and restructuring its existing debt with Comerica Bank" and, if necessary, to "secure the financing from other sources acceptable to the [Debtor]." The Debtor paid Sierra a consulting fee of $10,000, as well as payment for expenses, in connection with the Agreement.

As set forth in the Debtor's Complaint, the Judsons and Sierra knew that the personal guarantees by the Koellings to Comerica, as well as the high level of debt and debt service owed by the Debtor, were an integral part of the financing problems that the Judsons and Sierra were engaged to resolve.

In connection with their services and duties to Plaintiffs, the Judsons and Sierra were necessarily given access to confidential and proprietary information regarding Electrochem and the Koellings, including information regarding the Debtor's finances. They promised in writing not to disclose such information except with permission from and for the benefit of the Debtor and the Koellings, and would "not use such information to directly or indirectly compete with the [Debtor] or use such information for the benefit of Sierra or any third party."

Throughout January 2000, the Debtor and the Koellings met with the Judsons and Sierra. During those meetings, the Judsons represented that they were working with the Company to prepare information for other investors for the Debtor to replace the Comerica Flat Note Loan, and that they would use their "expertise" in negotiating loans with banks to assist the Debtor in such negotiations with Comerica.

By February 15, 2000, whatever the Judsons had in mind for Debtor did not result in either further equity financing for the Debtor, or a restructuring of the Comerica debt. Comerica-

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 9 of 22

again, notwithstanding that the Debtor's debt was being serviced- demanded that action be taken to "take out" its debt, or it would immediately move to foreclose on the loans and the personal guarantees.

**D. The Judsons' and Sierra's Conflict Of Interest With Regard To Comerica.**

Having been paid $100,000, the Judsons and Sierra accomplished nothing after more than a year. Ultimately, the Judsons told the Debtor, the Koellings, and Comerica that while they were unable to find any interested parties in investing new capital with the Debtor, they would instead seek to fund their own investment company for such purpose. The Judsons then created their own investment company- Burlingame Capital Partners- and then "advised" Debtor that it would provide the Debtor with financing.[2]

In or around July 2001, Burlingame was funded. Not coincidentally, Comerica advised the Debtor that unless it consummated a deal with Burlingame, the bank would declare a covenant default on the company's loans, and thereafter seek to foreclose upon the company's assets. On or about November 26, 2001, the Judsons induced and pressured Debtor to enter into a loan transaction with Burlingame Capital Partners ("Burlingame Transaction"), in the principal amount of $2,000,000. The Burlingame Transaction consisted of a Loan and Security Agreement with an effective rate of interest on principal of up to 27% per annum, subordinated to the indebtedness to Comerica.. As part of the Transaction, the Koellings signed personal guaranties of Debtor's indebtedness to Burlingame, and granted to Burlingame security interests in essentially all of their assets, including all of their stock in Debtor. An additional facet of the Transaction was that Comerica would receive an up front fee of $500,000, and the Judsons and Sierra would receive $60,000.

**E. Conflicts Of Interest With Regard To The Burlingame Transaction.**

As set forth in greater detail in the Complaint herein, the Debtor believes that the Judsons, Sierra, and Burlingame's transactions with Debtor and its principals are fraught with

[2] The Judsons also operated Burlingame Capital and Burlingame Capital Management, which acted as the general partner of Burlingame Capital Partners.

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 10 of 22

obvious conflicts of interest and self-dealing. Their actions were detrimental to the Debtor, and precipitated the filing of this Chapter 11 case.

On the one hand, the Judsons and Sierra had undertaken a fiduciary duty to Debtor to act on its behalf and arrange for favorable financing. At the same time, though, Robert Judson, the managing member of Burlingame Capital Management, which in turn is the general partner of Burlingame Capital Partners, negotiated and signed the Loan and Security Agreement.

As a fiduciaries to the Debtor, the Judsons and Sierra were privy to the Debtor's confidential financial information, and its dealings with Comerica. They became familiar with its operations, became educated about the market for electroplating in the Bay Area, obtained knowledge of the Debtor's strategies for increased revenues, and, most importantly, became more than well aware that the Debtor was not only already in technical default of certain financial covenants to Comerica, but could not possibly service both the Comerica debt and the Burlingame Transaction at the same time. Nonetheless, counseling Debtor to enter into the oppressive Burlingame Transaction- through which Debtor paid Sierra a "success fee" of $60,000, [3] and through which Burlingame obtained a security interest in the assets of both the Debtor and its principals- was the sum of the Judsons' "management consulting" to the Debtor.

The Judsons, Sierra, and Burlingame knew at the time they proposed the Burlingame Transaction that the loan was not in the best interest of the Debtor. In fact, the Transaction has operated to the prejudice and damage to the Debtor and its principals, the Debtor's efforts to effectively manage its debt to Comerica, and Debtor's ability to take advantage of the increase in the demand for its services experienced in 2003 and 2004. The Burlingame Transaction seems to have benefitted every party concerned except for Debtor and its principals: from the Burlingame loan proceeds, Comerica received a $500,000 fee; the Judsons and Sierra received hundreds of thousands of dollars in success fees, advisory fees, and interest payments; and - most

---

[3]As part of the Burlingame Transaction, the Judsons claimed a fee of $60,000.00, which they purported to direct or divert to the lender, Burlingame Capital Partners. Debtor is informed and believes that one of the reasons for the diversion of the broker's fees is that Sierra itself does not have either a California Finance Lender's License or a California Real Estate Broker's License, and is therefore not entitled to broker such loans or obtain such fees.

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 11 of 22

importantly- the Judsons, through Burlingame, obtained the ability to not only take over the Debtor, but to liquidate the Koellings' personal assets.

**F. Threats Of Foreclosure By Sierra And The Judsons, And Commencement Of The State Court Proceeding.**

Not surprisingly- despite anticipating sales figures which have not been experienced in several years- the Debtor defaulted on its obligations to Burlingame, and, as a result of the Transaction and numerous subsequent threats of foreclosure by the Judsons and Burlingame, has been unable to negotiate alternative financing or otherwise restructure its finances through an infusion of equity.

On or about October 23, 2002, the Debtor and the Koellings filed an action in the San Mateo County Superior Court (the "State Court Action") against the Judsons, Sierra and the Burlingame entities.[4]

Among the causes of action asserted therein against the Judsons, Sierra and the Burlingame entities by the Debtor are breach of fiduciary duty, rescission of contract, unfair business practice, and breach of contract, related to the facts set forth hereinabove.

In addition to filing an Answer in the case, the Judsons and the Burlingame entities filed a cross-complaint against the Debtor and its principals, among other persons, under numerous theories for relief, including breach of guaranties, fraudulent transfer, and interference with contract.

**G. Electrochem Funding LLC Purchases The Comerica Note.**

The Debtor is informed and believes that an entity known as Electrochem Funding LLC ("Funding") was founded by the Judsons after the commencement of the State Court Action. Funding has acquired all of Comerica's right, title and interest in the Comerica debt, the aggregate principal amount of which, the Debtor has been informed, was $2,520,054.18, plus accrued interest of $12,186.35, as of the date this Chapter 11 case was commenced.

---

[4]The State Court Action is styled QMECT, Inc. dba Electrochem et al. v. Robert D. Judson, Jr. et al., and has assigned case number CIV 426631.

## II. COMMENCEMENT OF THIS CHAPTER 11 CASE.

The Debtor filed its Voluntary Petition under Chapter 11 of the Bankruptcy Code on February 27, 2004.

On or about March 2, 2004, the Debtor removed the litigation to this forum.

On March 5, 2004, Burlingame and Funding filed its "Motion of Burlingame Capital Partners II, L.P. and Electrochem Funding, LLC. for Dismissal of the Case or, in the Alternative, Relief from the Automatic Stay." The parties thereafter conducted numerous depositions, on a compressed schedule, in order to have the matter heard over several days during the final two weeks of March. That motion was denied.

## III. PROPOSED AMENDMENT OF THE DEBTOR'S COMPLAINT.

As set forth supra, prior to the hearing on this matter, the Debtor intends to file its motion to amend the Complaint originally filed in the State Court Action. In addition to the claims already asserted against the Defendants- and before the hearing on this matter- the Debtor intends to file a motion to amend its Complaint herein, to reflect that the reason this Court must retain jurisdiction over this case is because the allegations set forth hereinabove constitute grounds for equitable subordination of any claims the Defendants assert against the Debtor in this case. Since such an equitable subordination claim is a "core" proceeding under 28 U.S.C. 157(b)(2)(O), and this is the only forum where such a claim may be asserted. The Defendants' Motion is premature, in that the Court has not had the opportunity to rule on whether amendment of the Debtor's Complaint is appropriate, and whether a claim for relief for equitable subordination lies against the Defendants.

## LEGAL ARGUMENT

This Court should deny Defendant's Motion. By seeking to have the Court abstain from this Adversary Proceeding before the Debtor has an opportunity to amend the Complaint and assert its equitable subordination claim herein, the Defendants are nakedly trying to subvert the power of this Court to subordinate claims or adjudicate equities arising out of the *relationship* between the Debtor and Defendants. Defendants cannot be permitted to do so. Before rendering any decision as to whether this Court's should exercise jurisdiction over this litigation, the Court

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 13 of 22

should consider the Debtor's prospective equitable subordination claim.

## I. TO THE EXTENT THE DEBTOR WILL ASSERT AN EQUITABLE SUBORDINATION CLAIM AGAINST DEFENDANTS, MANDATORY ABSTENTION IS NOT APPROPRIATE.

### A. Criteria For Application Of Mandatory Abstention.

Mandatory abstention is governed by 28 U.S.C. § 1334(c)(2). That statute provides as follows:

> Upon timely motion of a party in a proceeding based upon a State law claim or State claw cause of action, related to a case under title 11 but not arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

There are thus six elements to mandatory abstention: (1) a timely abstention motion; (2) a state law claim or cause of action; (3) no independent federal jurisdictional basis; (4) a claim "related to" but not "arising in" or "arising under" title 11; (5) a parallel action in state court; and (6) the ability to timely adjudicate the state court action. 9281 Shore Road Owners Corp. v. Seminole Realty Co., 214 B.R. 676 (Bankr E.D. N.Y. 1997).

### B. Equitable Subordination Is A "Core Proceeding" Under The Bankruptcy Code.

To the extent that Debtor intends to assert an equitable subordination claim against Defendants, mandatory subordination is not appropriate. Equitable subordination is a "core" bankruptcy claim; that is, it "arises in" or "arises under" title 11.

A claim for equitable subordination must be brought by an adversary proceeding in the Bankruptcy Court. Fed Bankr. P. 7001(8); In re Danbury Square Associates, 153 B.R. 657 (Bankr. S.D.N.Y. 1993). It is a claim unique to the Bankruptcy Code, and is a "core proceeding" under 28 U.S.C. § 157.

Equitable subordination is governed by Section 510(c) of the Bankruptcy Code. The statute provides:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may-

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

Section 510(c) is a codification of the Bankruptcy Court's pre-Code equitable power to subordinate claims, interests, or relationships and to adjudicate equities among creditors. H.R. Rep. No. 595, 95th Cong., 1st Sess. 359 (1977) U.S. Code Cong. & Admin. News, pp. 5787, 6315. Rather than specify the criteria to be used by Bankruptcy Courts in subordinating claims under §§ 510(c), Congress intended Bankruptcy Courts to be governed by judicially created principles of equitable subordination. S. Rep. No. 989, 95th Cong., 2d Sess. 74 (1978); U.S. Code Cong. & Admin. News 1978, pp. 5787, 5860; 124 Cong. Rec. S. 17,412 (Oct. 6, 1978); 124 Cong. Rec. H. 11,095 (September 28, 1978). See, e.g., Wilson v. Huffman (In re Missionary Baptist Foundation of America Inc.), 818 F.2d 1135, 1142 (5th Cir. 1987).

It is a matter of hornbook law "that a bankruptcy court has the authority to subordinate claims on equitable grounds." See Pepper v. Litton, 308 U.S. 295, 306, 60 S. Ct. 238, 84 L. Ed. 281(1939). The basis for these rules of equitable subordination is that the bankruptcy court has the equitable power and the duty "to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." Pepper v. Litton, 308 U.S. at 303, 60 S. Ct. at 246. As stated in In re EMB Associates, Inc., 92 B.R. 9 (Bankr. D.R.I. 1988), "the fundamental aim of equitable subordination is to undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results".

Without belaboring whether other elements of a mandatory abstention have been satisfied by Defendant, to the extent Since equitable subordination is a "core" proceeding under 28 U.S.C. § 157, unique to the Bankruptcy Code and to the jurisdiction of bankruptcy courts, mandatory abstention cannot be applied. Generally, core proceedings are deemed proceedings "arising in" or "arising under" title 17. In re CRD Sales And Leasing, Inc., 231 B.R. 214, 218 (Bankr. D. Vt.

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 15 of 22

1999). "To be a core proceeding, an action must have as its foundation the creation, recognition, or adjudication of rights which would not exist independently or a bankruptcy environment although of necessity there may be peripheral state involvement." Id. (quoting Unsecured Creditors Committee v. Noyes, 73 B.R. 470, 478 (Bankr. D. Vt. 1987). The Defendants cannot dispute that to the extent an equitable subordination claim is asserted against them by the Debtor, such a claim is "core." See, e.g., Boyd v. Sachs, 153 B.R. 457, 461 (Bankr. W.D. Mich. 1993) (equitable subordination is a core matter under 28 U.S.C. §§ 157(b)(2)(K) and (O)).

**C. Mandatory Abstention Cannot Be Applied To A "Core" Proceeding.**

Without belaboring the above-enumerated six elements for application of mandatory abstention under 28 U.S.C. 1334(c)(2),[5] the Debtor respectfully submits that the doctrine cannot be applied to Debtor's prospective equitable subordination claim.

i. To The Extent That Debtor Will Assert An Equitable Subordination Claim Against Defendants, This Litigation Is Not Based Wholly Upon State Court Causes Of Action.

The Debtor concedes that until this Chapter 11 case was commenced, the State Court Action sounded in California law. Such is not the case postpetition, however. The Debtor did not- and could not have- asserted a "core" equitable subordination claim against the Defendants. As set forth above, it expects to move to do so, thus precluding application of mandatory abstention.

ii. With The Prospective Amendment Of The Complaint, This Litigation Is A "Core Proceeding."

The Debtor's prospective claim for equitable subordination will necessarily seek an adjudication of rights which are unique to the bankruptcy system, and are "core." Mandatory abstention should not be applied to this proceeding, notwithstanding that the case was pending in state court prepetition, and not withstanding that the case otherwise would have been

---

[5]The Debtor does not dispute, for example, that the abstention motion was timely filed; indeed, it was filed prematurely, before Debtor had an opportunity to amend the Complaint to add its equitable subordination claim. The Debtor also does not dispute that the State Court Action was pending in the San Mateo Superior Court at the time of Chapter 11 case commencement.

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 16 of 22

characterized as "related to" this case.

iii. Whether "Equitable Subordination" Should Be Applied In This Matter Is Necessarily A Federal Question.

As amended, the State Court Action- removed to this Court- will involve a federal question; indeed, nothing could be more "federal" than a "core" proceeding arising specifically under Section 510(c) of the Bankruptcy Code.

iv. The San Mateo Superior Court Cannot Adjudicate Whether Defendants' Claims In This Case Should Be Equitably Subordinated.

In their Motion, the Defendants assert- without realizing that the Debtor contemplated, by removing the State Court Action to this Court, asserting an equitable subordination claim- that the San Mateo Superior Court could "timely adjudicate" the case. That contention might have been accurate if the allegations and averments contained in the Complaint did not adduce facts sufficient to set forth a claims for equitable subordination. As the Complaint will be amended, not only will the San Mateo Superior Court not be in a position to "timely" adjudicate the merits of the case, it will not be able to adjudicate the "core" proceeding at all.

## II. PERMISSIVE ABSTENTION SHOULD ALSO NOT BE APPLIED TO DEBTOR'S PROSPECTIVE EQUITABLE SUBORDINATION CLAIM.

### A. Standards For Permissive Abstention Generally.

Permissive abstention is governed by Section 1334(c)(1) of the Bankruptcy Code. That statute states as follows:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under Title 11 or arising in or related to a case under Title 11.

In In re Tuscon Estates, the Ninth Circuit Court of Appeals identified twelve factors to be considered by bankruptcy courts in determining whether the interests of justice warrant permissive abstention: (1) the effect of the lack thereof on the effective administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy law issues, (3) the difficulty or unsettled nature of the applicable law, (4) the

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 17 of 22

presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. §1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than the form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of (the bankruptcy court's) docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties. In re Tucson Estates, Inc., 912 F.2d 1162, 1167 (9th Cir. 1990). Failure to consider the factors is an abuse of discretion by the bankruptcy court. Id., at 1169. No single factor delineated in Tucson Estates is dispositive to the determination. Instead, a bankruptcy court should "consider each of the factors and the evidence relating thereto, and weigh its importance in the decision (to abstain)." In re Lazar, 200 B.R. 358, 373 (C.D. Cal. 1996).

The Debtor respectfully submits that- for largely the same reasons why mandatory abstention is not appropriate- this Court should not exercise its discretion to permissively abstain from hearing the case.

**B. This Court Should Not Abstain From Hearing Debtor's Equitable Subordination Claim Under 28 U.S.C. 1334(c)(1).**

In their Motion, the Defendants argue at length that discretionary abstention is appropriate in this matter. Again, Defendants' Motion is premature: they have not considered that Debtor will amend its claims for relief herein to assert its equitable subordination claim. Without considering that claim, Defendants' analysis of whether permissive abstention is appropriate is completely misplaced.

This case is analogous to the circumstances considered by the United States Bankruptcy Court for the District of Vermont in In re CRD Sales and Leasing, Inc., 231 B.R. 214 (Bankr. D. Vt. 1999). In that case, debtors filed a voluntary Chapter 11 proceeding on the eve of a creditor's state court foreclosure action. The debtors then removed the litigation to bankruptcy court, and asserted an equitable subordination claim against the creditor. The creditor- like



Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 18 of 22

Defendants here- sought by mandatory and permissive abstention of the case.

The Court first disposed of the creditor's "mandatory abstention" argument as follows:

> Foreclosure proceedings are based on state law, and are generally deemed "non-core." The foreclosure action here, however, is based upon the same facts as Debtors' equitable subordination claim. Under 28 U.S.C. § 157(b)(2)(B)(K) & (O), equitable subordination is a core matter and may not be remanded to state court. To reach a decision on the equitable subordination claim, we must necessarily determine the validity of (the creditor's) attempted state court foreclosure, and vice versa. This interaction between the foreclosure action and the equitable subordination claim makes it difficult to determine whether or not the foreclosure action should be deemed core for the purposes of our jurisdiction.
>
> * * *
>
> While not explicitly saying that foreclosure proceedings intertwined with equitable subordination claims are core proceedings, courts have consistently noted the two should be heard in the same forum . . . *once an equitable subordination claim or defense is raised, any actions, claims or liens so intertwined with that equitable subordination claim should be heard by the bankruptcy court . . . In so doing, we do not ignore the fact that foreclosure actions are usually deemed non-core. When inextricably linked with the equitable subordination claim, however, a core claim that must be heard here, we think it is safe to say the entire proceeding is core.*

CRD Sales and Leasing, 231 B.R. at 218-219 (emphasis added).

The Court then just as easily dismissed the creditor's claim that discretionary abstention was somehow appropriate to the case. It stated:

> We also deny (the creditor's) request for permissive abstention under 28 U.S.C. § 1334(c)(1). As noted above, it is not practical to sever the state law claims from the equitable subordination claim . . . A remand here would demand that the same factual allegations be heard twice, in two different forums, creating the possibility of inconsistent results.

CRD Sales and Leasing, 231 B.R. at 220-221.

The reasoning applied by the Court in CRD Sales and Leasing should be applied to Defendants' request for permissive abstention. To remand the litigation now would be unwarranted, as the facts underlying the State Court Action and the Debtor's prospective equitable subordination claim are one in the same.

**C. The Tucson Estates Factors Militate In Favor Of This Court's Retention Of Jurisdiction.**

Indeed, the holding in CRD Sales and Leasing is echoed through application of the various factors set forth in the Ninth Circuit Court of Appeals' Tucson Estates decision. The factors applicable to this proceeding militate in favor of retention of the proceeding by this Court.

i. Abstention Would Hinder the Efficient Administration of the Estate.

Given that Debtor expects to assert an equitable subordination claim against Defendants, abstention will neither expedite nor facilitate the administration of the estate. As amended, the claims central to this adversary proceeding are inherently intertwined with the Debtor's bankruptcy estate and the Bankruptcy Court should retain jurisdiction to oversee the determination of such proceedings. [6]

ii. State Law Issues Are Interwined With An Equitable Subordination Claim.

Regardless of the theories under which the parties litigated while this case was before the San Mateo Superior Court, the Debtor's assertion of an equitable subordination claim will effectively render the entire action- including matters of California law- a core proceeding, as occurred in the CRD Sales and Leasing case. Issues in this Adversary Proceeding are inextricably related to the bankruptcy case.

iii. Relevant State Law Issues Are Not Novel.

None of the allegations, averments, or claims raised by any of the parties in the State Court Action present novel issues of law that require specific attention from a state court.

iv. This Adversary Proceeding Is Closely Related to the Main Case.

As set forth hereinabove, the Debtor claims that Defendants' self-dealing precipitated the

---

[6]This Court is more than conversant with the issues pending in this case. The Court has heard and rendered its decisions in two motions by the Debtor to use Cash Collateral, and in Burlingame's motion for relief from the automatic stay. Moreover, the Court has been updated on developments in the bankruptcy case at a status conference on April 19, 2004. A status conference in this Adversary Proceeding is scheduled for May 6, 2004. This Court, then, is current on all of the facts and issues surrounding the Debtor's Chapter 11 case and this Adversary Proceeding.

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 20 of 22

collapse of this company, and prevented it from effectively straightening out its finances. Since the Debtor not only seeks damages from Defendants but also will seek equitable subordination of any claims filed herein by Defendants, this case is closely related to the main bankruptcy proceeding. The two cannot be effectively separated.

v. As Set Forth Supra, This Case Involves A Core Claim.

Further militating in favor of permissive abstention is that the Debtor's prospective equitable subordination claim, as set forth above, is core. That claim- to say nothing of the other claims set forth in the parties' claims against one another- will significantly affect the administration of the estate. Defendants' Cross-Complaint further seeks to set aside alleged fraudulent transfers by the Debtor. Such an action is specifically delineated as a core proceeding by § 157(b)(2)(H), which- once removed- should not be remanded by the Bankruptcy Court. See generally In re Pacific Gas & Electric Co., 281 B.R.1 (N.D. Cal 2002).

vi. Severance of Claims Is Not Feasible.

Again, as discussed supra and observed by the court in CRD Sales and Leasing, the Debtor's prospective core equitable subordination claim against Defendants cannot be somehow severed to allow the San Mateo Superior Court to determine the issues involved. As was the case in CRD Sales and Leasing, to attempt to do so would demand that the same factual allegations be heard twice, in two different forums, creating the possibility of inconsistent results.

For the reasons set forth above, discretionary abstention is no more applicable to an equitable subordination case than is mandatory abstention. This persuasive reasoning of the court in CRD Sales and Leasing makes sense here: this case should be heard by one court- this Court.

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court deny the Defendants' Motion, pending Debtor's further amendment of the Complaint herein. The Debtor's Motion, at this stage of the proceeding, does not make sense, as equitable subordination is discussed not even a single time therein, even though it is the very reason why the Debtor removed the action to this forum in the first place. If the Defendants have cause to remand the

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 21 of 22

case, then they should assert the reasons why it should be remanded only after this Court has been presented with the Debtor's core equitable subordination claim.

Date: April 26, 2004

MANASIAN & ROUGEAU, LLP

By: ______________________
Paul E. Manasian
Attorneys for Debtor in Possession
QMECT, INC

17

DEBTOR'S OPPOSITION TO MOTION FOR ABSTENTION AND REMAND

Case: 04-04077 Doc# 17 Filed: 04/26/04 Entered: 04/26/04 18:45:05 Page 22 of 22